162 So.2d 274 (1964)
ATLAS SEWING CENTER, INC., a Florida corporation, a/k/a Acme-Atlas Stores, a Florida corporation, Appellant,
v.
BELK'S DEPARTMENT STORE OF WEST PALM BEACH, FLORIDA, INCORPORATED, a Florida corporation, Appellee.
No. 2873.
District Court of Appeal of Florida. Second District.
March 27, 1964.
William H. Morrow, Jr., of Patton & Kanner, Miami, for appellant.
B.F. Paty, Jr., of Paty, Downey & Lewis, West Palm Beach, for appellee.
*275 SMITH, Chief Judge.
The appellee, as plaintiff in the court below, filed its complaint against the defendant-appellant, claiming that the defendant was indebted to the plaintiff by virtue of a series of written agreements, copies of which were attached to the complaint as exhibits. The defendant's answer was, in effect, a general denial that it was indebted to the plaintiff. The trial court, sitting without a jury, determined that the agreements were ambiguous, heard the testimony of the parties in explanation of the ambiguity, and rendered judgment in favor of the plaintiff.
The defendant contends on appeal that there is no ambiguity appearing within the terms of the agreements; that the unambiguous terms of the agreements are conclusive; and that, therefore, the lower court was not at liberty to modify the agreements by and through an interpretation based upon oral testimony of the parties. The principle of law is well settled that a court may not hear oral testimony in interpreting a contract which is clear and unambiguous. 7 Fla.Jur. Contracts, § 74. Also well settled is the principle that a contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. 7 Fla.Jur. Contracts, § 90. Our task is to apply these principles of law to the contract between the parties in the case at bar. We pause here to point out that we use the term "contract" because the several so-called "agreements"  although embodied in different writings  must be read together as constituting one contract. As will hereinafter be made to appear, the initial agreement was modified and amended in certain particulars by subsequent agreements, all of the terms of which were then incorporated by specific reference into the non-negotiable promissory notes (simple contracts) which were intended to evidence the indebtedness which forms the basis of the plaintiff's claim. See 12 Am.Jur. Contracts, §§ 405, 406; 11 Am.Jur.2d Bills and Notes, § 1.
The original agreement between the parties was a lease from Belk's to Atlas, the expressed object of which was to permit Atlas to operate a sewing machine and vacuum cleaner department within the department store operated by Belk's. The rental to be paid was computed on a certain percentage of net sales made by Atlas. The term "net sales" was defined as gross sales and service charges less adjustments and returned goods as approved by Belk's. As to non-cash sales, Belk's agreed to pass on all credits, guarantee all accounts passed upon and make all collections. Belk's was to pay Atlas in full for such charge items at the end of each month. Atlas was required to conduct its business under the name of Belk's, and the parties agreed that the "sales check system" covering case, C.O.D., charge sales and cash refunds as used by Belk's would be exclusively used by Atlas. It was further provided that all goods sold to, and all communications with, Atlas' customers would be in the name of Belk's.
Within six months the parties entered into a second agreement which was expressly added to and made a part of the first agreement. The second agreement provided in effect that Belk's would assign all time-payment sale contracts to Atlas as security for a loan which Atlas would make to Belk's in an amount equal to 75% of the balance remaining unpaid on the contracts; that Atlas would thereafter process credit applications and make collections, but that Belk's would have the authority to accept or decline any contracts for credit; and that, in the event of termination of the lease, Belk's had the option to either re-purchase the assigned accounts and liquidate their loan from Atlas or have Atlas continue to collect the accounts.
Finally, in the following year, the parties entered into an "Agreement and Amendment to Lease" providing as follows:
"ATLAS will purchase and remit payment within 5 days thereafter all of the sewing machine and vacuum cleaner contracts presently assigned to *276 ATLAS by BELK'S and ATLAS will finance and own all time sale contracts made by the ATLAS leased department in BELK'S in the future under the following terms and conditions:
"ATLAS will purchase the presently existing contracts from BELK'S at its present unpaid balance (less carrying charges). ATLAS will withhold $20,000.00 from this purchase price as a reserve fund, receipt of which is hereby acknowledged, to be used to charge returns, adjustments, repossessions, etc., that occur after cancellation of the presently existing lease arrangements and during the period of liquidation of the contracts. Upon continuance of the existing lease arrangement, ATLAS will refund to BELK'S $5,000.00 on September 1, 1957, $5,000.00 on September 1, 1958 and $5,000.00 on September 1, 1959  the remaining $5,000.00 to serve as a reserve for contingencies. (Contingencies will be the full loss resulting from sales returns, repossessions, uncollectible accounts, etc., during the period of liquidation of time sales contracts.)
"All future sales made by the ATLAS leased sewing machine and vacuum cleaner department will be written directly on ATLAS contracts and will remain the sole property of ATLAS.
"ATLAS will remit a monthly settlement and accounting of all net sales (net sales to be the amount after deducting all returns, carrying charges and/or adjustments) twenty (20) days after the close of each month. The basis of this monthly report will be from the summation of daily cash reports prepared by the ATLAS department and subject at all times to inspection or audit by BELK'S.
"All sales will be made on a contract directly with the customer as `Atlas Sewing Centers, Inc.' in BELK'S Department Store.
"Contract forms, credit statements, payment books and all collection work to properly service and collect the accounts will be supplied by ATLAS.
"In the event of cancellation of the Lease between ATLAS AND BELK'S, ATLAS will receive full cooperation from BELK'S in expediting the successful liquidation of these accounts. Any uncollectible accounts, returns, repossessions or adjustments during the period of liquidation will be charged against the reserve account. Upon completion of the liquidation, the balance remaining in the reserve fund will be remitted to BELK'S, (not to exceed one (1) year from date of cancellation).
"IN CONSIDERATION OF ATLAS financing the receivables, BELK'S will reduce ATLAS' monthly rental to ten (10%) per cent of total net annual sales under the same terms as provided in the original Lease between ATLAS and BELK'S dated June 30, 1955, and amended November 12, 1955.
"ATLAS SEWING CENTERS, INC. will have the right to assign or sublet this agreement to any of its subsidiaries without the prior consent of BELK'S Department Store.
"The parties hereto agree that any of the terms of the original lease agreement or any subsequent agreements executed by and between them, or any of them, which are inconsistent with the terms of this agreement shall be modified so that the terms of the within agreement shall control. * * *"
To further evidence the $20,000 withheld from the purchase price as a reserve fund, Atlas executed and delivered to Belk's four promissory notes, each in the amount of $5,000 and bearing due dates to correspond *277 with the schedule for refund of the reserve fund as set forth in the last agreement quoted above. These non-negotiable notes expressly provided that they were contingent upon fulfillment of the terms of the lease agreement as twice amended.
From the foregoing it appears that by the terms of the original lease agreement Belk's became the owner of all time-payment sale contracts. The effect of the first amendment, insofar as pertinent here, was to modify the original agreement so that Atlas would process credit applications, agreements and collections, but Belk's could either approve or decline time-payment sale contracts. However, Belk's continued to guarantee all contracts it approved.
With the foregoing in mind, we proceed to an analysis of the final agreement between the parties. We note initially that the final agreement specifically provides that if the original lease, as modified by the first amendment, is inconsistent with the last amendment, then the entire agreement is modified so that the terms of the final agreement control. There are two principal provisions of the final agreement: (1) Atlas was to purchase from Belk's the presently existing time-payment sale contracts; and (2) Atlas would finance and own all future time-payment sale contracts made by it. These two provisions, which constitute the essence of the final amendment, were set out in the first sentence of the instrument. This sentence concludes with the words "under the following terms and conditions", after which there is a series of sub-paragraphs containing terms agreed upon by the parties. Some of these "terms and conditions" apply to or control provision (1) above, while some of them apply to provision (2).
The terms and conditions included in the first sub-paragraph clearly pertain to provision (1)  the purchase by Atlas of the presently existing contracts. This sub-paragraph recites that the purchase price for the presently existing contracts would be the amount of their present unpaid balance, less carrying charges; that Atlas would withhold from this purchase price the sum of $20,000 as a "reserve fund"  against which to charge returns, adjustments and repossessions that were expected to occur after cancellation of the lease agreement (in the event such cancellation occurred) but before all of the contracts were liquidated; and that, in the event the lease agreement continued, the "reserve fund" would be refunded to Belk's according to the following schedule: $5,000 on the first day of September in each of the three succeeding years, 1957, 1958 and 1959. The remaining $5,000 was to be retained by Atlas to serve as a reserve for contingencies, and the term "contingencies" was defined as "the full loss resulting from sales returns, repossessions, uncollectible accounts, etc., during the period of liquidation of time sale contracts."
The terms and conditions of the second, third, fourth and fifth sub-paragraphs in the final agreement pertain to provision (2), dealing with future contracts. These sub-paragraphs provide that the future contracts would be written on Atlas forms and would remain the sole property of Atlas; that Atlas would remit to Belk's a monthly statement of its "net sales" of vacuum cleaners and sewing machines; and that Atlas would be solely responsible for servicing and collecting the accounts on these future contracts.
It is the sixth sub-paragraph which causes the difficulty here. It first provides that, in the event the lease between the parties is cancelled, Atlas would receive full cooperation from Belk's in expediting the successful liquidation of "these accounts". The sixth sub-paragraph goes on to provide that any uncollectible accounts, returns, repossessions or adjustments during the period of liquidation would be charged against the reserve account. The use of the term "any" creates ambiguity. Does this mean that Atlas could charge against the reserve fund any losses it incurred on time-payment *278 sale contracts entered into by it subsequent to the date of the final amendment? Or does the provision mean that Atlas could charge the reserve fund only with losses on the "presently existing contracts" purchased from Belk's by the terms of the first provision of the final agreement? The defendant-appellant vigorously contended that the first interpretation is the proper one, while the plaintiff-appellee contended as strongly that the latter interpretation is correct. The lower court viewed this sub-paragraph as so ambiguous as to allow the parties to testify in explanation thereof. We find no fault with this conclusion.
We have endeavored to read the foregoing provisions of the sixth sub-paragraph in the light of the language thereof as it is ordinarily and commonly understood, but we cannot say that the provisions can be construed according to their own terms. The rights and interests of the parties are not definitely and clearly stated. The language employed renders the agreement susceptible of two meanings: (1) Atlas could charge against the "reserve fund" any losses it incurred on time-payment sale contracts, including those entered into by it subsequent to the date of the final amendment; or (2) Atlas could charge the "reserve fund" only with losses incurred on those contracts entered into prior to the final agreement. The court below properly received the testimony of the parties to ascertain the meaning of the agreement in accordance with established rules of interpretation. Friedman v. Virginia Metal Products Corp., Fla. 1952, 56 So.2d 515, 33 A.L.R.2d 956.
There is substantial, competent evidence in the record to sustain the lower court's determination of the intention of the parties and the objects to be accomplished by their agreement. The court found that the purpose of the "reserve fund" was to insure performance of Belk's guarantee of those time-payment sale contracts written prior to the last amendment; that this guarantee did not include contracts made subsequent to the last agreement, since such an arrangement would not be reasonable in view of the fact that the parties made it clear that all future contracts would be the sole responsibility of Atlas; and that, therefore, Atlas could charge the "reserve fund" only with the losses it incurred on contracts purchased by it under the terms of the final agreement.
The judgment is affirmed.
ALLEN and SHANNON, JJ., concur.